Filed 9/28/15  P. v. Olivares CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE OLIVARES,<br><br>    Defendant and Appellant. | B257171<br><br>(Los Angeles County<br>Super. Ct. No. BA391319) |

APPEAL from a judgment of the Superior Court of Los Angeles County. Jose I. Sandoval, Judge.  Affirmed.

David L. Polsky, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Michael C. Keller, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Defendant, Jose Olivares, was charged with murder (Pen. Code, § 187, subd. (a);[1] count 1) and assault on a child under the age of eight, causing the child's death (§ 273ab, subd. (a); count 2).

A jury found defendant not guilty as to count 1 but guilty on count 2. The trial court sentenced defendant to a state prison term of 25 years to life.

On appeal, defendant contends that the trial court committed prejudicial error by instructing a juror to disregard prior, personal experiences when deliberating, and to consider only the evidence presented at trial. We affirm.

## FACTS

### Prosecution

**A. The incident**

Isiah M. was three years old in February 2011. He lived with his mother (Diana M.), Diana's boyfriend (defendant), and the newly born son (D.) of Diana and defendant. The four shared a bedroom in the home of defendant's parents. Also living at the house were defendant's sisters (Lilliana and Jessica), defendant's brother (Ricardo), Jessica's infant son, and defendant's parents (Guadalupe and Martina).

Isiah was a generally healthy child who weighed approximately 40 pounds. He was very active and could be difficult to control.

Defendant worked restocking stores for the Coca Cola Company. He would generally leave for work around 12:00 or 2:00 in the morning, and get off work in the afternoon. His job was physically demanding, and he was usually tired when he came home from work.

On February 14, 2011, defendant clocked out of work at approximately 1:00 p.m. and went home. He went into the bedroom he shared with Diana and the children. Soon after, Diana put Isiah down for a nap on the bedroom carpet—which covered a bare concrete floor. Diana left to get food at a fast food restaurant, but returned home after

---

[1] All further statutory references are to the Penal Code unless stated otherwise.

2

realizing she forgot her credit card. Isiah was sleeping and appeared to be breathing normally when she returned. Diana retrieved her credit card and went back to the restaurant. At 3:14 p.m., while she was at the restaurant, Diana received a phone call from defendant asking her to order food for him.

Shortly thereafter, back at the home, Jessica heard defendant repeating, "Call 911." Jessica saw defendant holding Isiah, cradling him as one would a baby. Jessica called 911 at 3:20 p.m. Defendant handed Isiah to Guadalupe and called Diana.

Diana received defendant's call as she was driving home. Defendant sounded worried. He said to hurry home because something had happened to Isiah. Diana asked defendant what happened, but he just repeated that she should hurry home.

Guadalupe carefully carried Isiah outside. The family saw a neighbor who was a nurse, and asked her for help. Guadalupe gently placed Isiah on the ground.

Diana returned home shortly thereafter. Isiah was not breathing normally and he looked like he was having a seizure. Guadalupe and the neighbor attended to Isiah, while defendant stood by a neighbor's gate, not close to Isiah.

Diana asked defendant what happened. Defendant said that Isiah was jumping on the bed. He left Isiah in the bedroom while he walked into the bathroom. Defendant heard Isiah cry, went back in the bedroom, and saw Isiah on the floor.

The Los Angeles Fire Department arrived at 3:28 p.m. Paramedics immobilized Isiah's neck and head and transported him to Children's Hospital in Los Angeles. En route to the hospital, a paramedic noticed a bump on the left side of Isiah's head. Isiah vomited and exhibited other behavior characteristic of a head injury.

Dr. James McComb, then the chief of neurosurgery at Children's Hospital, examined and treated Isiah. He noted that Isiah had a bump on the left side of his head. Isiah's pupils were dilated, meaning he had abnormally high pressure in his head. His brain was swelling, causing compression on the brain and requiring immediate surgery. Dr. McComb removed part of Isiah's skull to try to reduce the pressure. Because the brain continued to swell, Dr. McComb was unable to replace the skull. He closed the

scalp and had Isiah transported to the pediatric intensive care unit. Isiah lacked any neurological function.

Dr. Barry Markovitz, a pediatrician in the intensive care unit, examined Isiah. Isiah was unresponsive and exhibited no brain function. Dr. Markovitz noted retinal hemorrhaging in both of Isiah's eyes, a condition "almost exclusively associated with the most severe forces that can be exerted upon a child's head and brain."

Dr. Grant Lee, an ophthalmology resident at the time of Isiah's hospitalization, determined that the hemorrhages involved all layers of Isiah's retinas. There were too many retinal hemorrhages to count.

Isiah was declared dead on February 17, 2011.

## B. Investigation

Los Angeles Police Officer Antonio Vargas spoke with defendant at the hospital. Defendant told Officer Vargas that he was in the bedroom sitting on the bed, while Isiah played with his toys and jumped on the bed. Defendant briefly left the room to use the bathroom. When he returned, he saw Isiah lying on the floor in a fetal position, crying.

According to defendant, he picked Isiah up and handed him to Guadalupe. Defendant called 911 and gave the phone to Jessica to talk. He then called Diana and told her to hurry home because something had happened to Isiah.

When asked how Isiah was injured, defendant said that he was unsure, but he believed that Isiah fell off the bed and hit his head on the floor. Defendant appeared to be nervous when speaking with Officer Vargas.

Detective Moses Castillo examined defendant's residence. The top edge of the bed in the bedroom measured 18 inches tall. The edge of a bookshelf was located about 18 inches away from the edge of the bed. Dumbbells were on the floor of the bedroom. No blood was found anywhere in the room. There was a hole in a bedroom wall, about three inches square, that appeared to be made by a fist. Defendant said that he previously caused the hole by punching the wall after having a bad day.

At the time of the incident, defendant was about five feet nine inches tall and weighed around 210 pounds.

4

## C. Expert testimony

Dr. McComb testified that Isiah had a subdural hematoma and there was a rupturing of the bridging veins, which connect the brain to the dura surrounding the brain. A significant amount of force was required to cause the injury, and it was "highly, highly, highly, highly unlikely" the injury could occur from a fall off an 18-inch-high bed. The injury was consistent with abusive head trauma—previously commonly known as shaken baby syndrome—which involves an acceleration-deceleration force. Dr. McComb testified that this was the most severe brain injury possible. He further stated that Isiah did not have an abnormally large head.

Dr. Markovitz testified that that the retinal hemorrhages in Isiah's eyes were associated with severe shaking and/or being thrown against a solid object. The hemorrhages were an indication that Isiah suffered an acceleration-deceleration injury— that "the forces of moving forward and backward are so forceful that they tear the tiny blood vessels in the back of the eye." The degree of injury that Isiah suffered would be "inconceivable" from a short fall.

Dr. David Whiteman, a forensic pathologist employed by the Los Angeles County Deputy Medical Examiner, performed Isiah's autopsy. He determined that Isaac died from head trauma and that the manner of death was homicide. The injuries were conclusive of abusive head trauma because there was evidence of large impact and acceleration-deceleration forces, which could only be caused by another person inflicting the injuries. When a victim is exposed to acceleration-deceleration forces the brain slides underneath the dura and small blood vessels are torn, causing blood to leak out of those vessels and pool between the brain and the dura. This causes the brain to push against veins that normally carry blood away from the brain; the blood that continues to get pumped into the brain is trapped. The brain swells, which decreases circulation and causes even more swelling. Dr. Whiteman testified Isiah's injuries could only be caused by a great deal of force, more force than he had seen in autopsies involving severe accidents or falls from several stories. There was additional hemorrhaging to Isiah's optic nerves, which Dr. Whiteman had seen only in cases of abusive head trauma.

Furthermore, the severe retinal hemorrhages, involving all layers of the retinas, could only be explained by abusive head trauma. Given the severity and type of injuries, they could not have been caused by accident or by a fall from a bed. Dr. Whiteman also noted bruising on Isiah's lower legs that appeared to be in a pattern of fingers grabbing the legs. Like Dr. McComb, Dr. Whiteman stated that Isiah's head was of normal size.

Dr. Donald Minckler, an ophthalmic pathologist, and the consulting eye pathologist for the Los Angeles coroner, also testified. He examined Isiah's eyes, and found the injuries to be absolutely typical of abusive head trauma. Dr. Minckler did not know of any other potential causes for Isiah's ocular injuries, which were principally retinal hemorrhaging and hemorrhaging around the optic nerves. Dr. Minckler found bleeding in all layers of the optic nerves and hemorrhages throughout the retinas. Potential medical causes of the hemorrhaging—including clotting disorders, leukemia, and lymphoma—were not present in Isiah. Dr. Minckler testified that, while abusive head trauma generally occurred in children two years of age and younger, it had been reported in children up to age six.

Finally, Dr. Carol Berkowitz, a pediatrician and a board-certified child abuse expert, testified for the prosecution. She likewise opined that Isiah suffered abusive head trauma. She testified that retinal hemorrhages can occur in cases of accidental trauma, but that such hemorrhages tend to be very localized, while Isiah's were very diffuse. Furthermore, Isiah's cerebral edema was indicative of abusive head trauma. According to Dr. Berkowitz, a fall from a bed was not a viable explanation for the extent of Isiah's injuries, and Isiah would not have suffered extensive bilateral retinal hemorrhages from such a fall. Furthermore, prior to the fall, Isiah was healthy and there was no indication that he had blood clotting problems.

**Defense**

**A. The incident**

Defendant's brother, Ricardo, was at home watching television when defendant returned from work on the day of the accident. Defendant appeared tired, as normal after work. Prior to the incident, Ricardo did not hear any yelling, screaming, or crying in the

6

house.  Defendant treated Isiah like his own son.  He was loving and caring with children, and was never rough with them.

Guadalupe was also at home when defendant returned home from work.  Before the incident, Guadalupe did not hear any commotion in the house.  Guadalupe saw defendant holding Isiah, saying he did not know what happened.  Defendant handed Isiah to Guadalupe, and Guadalupe carried Isiah outside, where he put him down on top of a towel and pillow.   Defendant treated Isiah with love.  Guadalupe had never seen him upset at Isiah or any other child.

### B.  Expert testimony

Dr. Marvin Pietruszka, a pathologist, testified on behalf of the defense.  According to Dr. Pietruszka, the position that retinal hemorrhages are caused by abusive head trauma is controversial in the medical community.  He stated that retinal hemorrhages can occur from a variety of causes, including virtually any condition that increases intracranial pressure.  Given Isiah's age, size, and ability to resist, Dr. Pietruszka believed that it would take an inordinate amount of force to shake Isiah in a manner leading to abusive head trauma.  Dr. Pietruszka would have expected to see signs of a neck or cervical injury if Isiah was shaken, but there were no such injuries.  Further, Dr. Pietruszka found no evidence of bruising consistent with shaking.

Dr. Pietruszka believed that Isiah's injuries were caused by a fall from the bed.  Blunt force trauma to the head resulting from the fall could have caused the subdural hemorrhage, which in turn could have increased the intracranial pressure and caused the retinal hemorrhages.  Although normally a person who falls gets a bruise, and clotting stops the bleeding, Dr. Pietruszka believed that Isiah experienced a "very unusual condition called consumptive coagulopathy," where the body uses up its clotting factors and then bleeds excessively.  Dr. Pietruszka stated that a blood test taken within 45 minutes of Isiah's arrival at the hospital showed that his blood was not clotting normally.

Dr. Khaled Tawansy, a pediatric retinal surgeon, testified that abusive head trauma generally occurs in children two years of age or younger because their heads are

7

disproportionately large, their neck muscles are weak, and they are light enough to be shaken. Dr. Tawansy had never seen abusive head trauma in a child as old and big as Isiah.

According to Dr. Tawansy, there are a dozen or more potential causes of retinal hemorrhaging. Although Isiah did have retinal hemorrhaging, it was not as extensive as would be expected from a shaking injury. Further, Isiah did not experience other injuries commonly associated with shaking, such as splitting of the retina. Dr. Tawansy opined that there was less than a 5 percent possibility that Isiah's injuries were caused by shaking. Instead, he believed that Isiah fell from the bed, hitting his head, which caused the subdural hematoma. The accumulation of blood caused the intracranial pressure to rise, leading to compression of the drainage from the retina and bleeding into the retina and the optic nerve. Furthermore, according to Dr. Tawansy, Isiah lost a massive amount of blood during the neurosurgery, which would cause all blood clotting factors to be consumed, creating coagulopathy and yet further bleeding. In addition, there was a sudden decrease in intracranial pressure when part of Isiah's skull was removed, which could cause hemorrhages in the retina. Dr. Tawansy further opined that Isiah had a disproportionately large head, making his head susceptible to recurrent bleeding.

Dr. Michael Weinraub, a pediatrician, testified that Isiah could have sustained his injuries by falling off the bed and hitting his head on the floor. According to Dr. Weinraub, Isiah had an usually large head, which could result in stretching of the bridging veins between the brain and the dura, making him more susceptible to bleeding and subdural hemorrhage. Dr. Weinraub stated that the fall caused Isiah's head to be pushed into the brainstem and this, combined with bleeding bridging veins, caused the brain to swell. The increased intracranial pressure then caused retinal hemorrhaging. In addition, due to the severe bleeding, Isiah developed a coagulation disorder, which caused yet more bleeding and could have caused further retinal hemorrhaging. Dr. Weinraub opined that due to Isiah's age, size, and neck control, it was unlikely that he suffered injuries due to shaking. Furthermore, one would expect to see a neck injury before there was rupture of bridging veins or retinal hemorrhaging. The bruises on

8

Isiah's legs were likely the result of being held down while having seizures in the hospital.

## DISCUSSION

During trial, one juror, Juror No. 39, informed the court that she and various family members experienced head injuries that either required hospitalization or caused death. The trial court instructed the juror to disregard those past experiences and base her decision on the evidence presented at trial. Defendant contends that the trial court's instruction constitutes prejudicial error.

## I. Factual background

On the third day of the prosecution's case-in-chief, outside the presence of the other jurors, Juror No. 39 informed the trial court that she had experienced two prior incidents involving head injuries.

In the first, when she was five years old, she was spinning around, making herself dizzy, when she fell and hit her head, knocking herself unconscious. She was put in a brace and hospitalized for two weeks. The second episode involved her brother, who, at 39 years of age, got drunk, fell, hit his head on a marble coffee table, and died.

Juror No. 39 said to the trial court, "I realize it has nothing to do with this case, but I just wanted to point out that that had happened to me." She asked the court whether she could bring up the incidents in deliberation. The trial court inquired whether either incident would prevent Juror No. 39 from being fair and impartial, to which she responded, "No." The court then told the juror that the incidents were not in evidence, and instructed her to base her decision on the evidence presented in the case, argument from counsel, and the jury instructions. Neither the prosecution nor the defense objected to this instruction.

Later, during deliberations, the trial court received a note from the foreperson stating that something in Juror No. 39's past experience was interfering with her ability to reach a decision and with deliberations. The trial court had Juror No. 39 come into the courtroom to discuss the matter. The juror then brought up a third incident, involving a cousin who had a short fall, hit his head, and fell into a river and drowned. The juror

9

stated, "I'm having problems because of the short fall saying, that—I mean, that most of the doctors feel that, you know, you can't—death can't be a result of a short fall." She related that the experiences were "weighing very heavily" on her and getting in the way of her making a decision. She said that there was "disagreement" in the jury room relating to her prior experience.

The trial court asked Juror No. 39 whether, if she remained on the jury, she could set aside her prior experiences with head injuries and make her decision based on the evidence in the case. She replied that she would try. At the request of the prosecution, the trial court questioned the foreperson, who stated that Juror No. 39 said that her past experiences were influencing her deliberations. The trial court then spoke again with Juror No. 39, telling her: "It is important, again, I'll remind you, as the jury instructions direct you, it's important to deliberate solely based on the evidence that you have heard in this case. . . . [I]f at one point you genuinely believe that there's an issue here that's going to get in the way of your ability to meet that obligation as a juror, that is to say, decide this case solely on the evidence independent of anything else that may have happened in your life or whatnot, do let me know, okay? And there's no problem with that . . . . It's just very important information the court must have so that the entire jury make their decision based only on the evidence. Okay?" Juror No. 39 replied, "All right." After some further discussion the court again instructed the juror that she had "an obligation solely to make the decision in this case based on the evidence." The juror responded, "Right," and returned to deliberations. Neither the prosecution nor the defense raised an objection.

## II. <u>Failure to object</u>

Defendant contends that the trial court erred by instructing Juror No. 39 to base her decision on the evidence presented at trial and to disregard her personal experiences with head injuries. On two separate occasions at trial, the trial court delivered the instruction to the juror. On neither of those occasions did the defense object.

The issue of whether the trial court's instructions were improper was forfeited. Unless an error affects a defendant's substantial rights, resulting in a miscarriage of

10

justice, failure to object to instructional error forfeits the issue on appeal. (*People v. Anderson* (2007) 152 Cal.App.4th 919, 927.) Furthermore, "'[a] party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.'" (*People v. Hart* (1999) 20 Cal.4th 546, 622.) As we explain below, the trial court's instructions were not incorrect. Moreover, the instructions did not result in a miscarriage of justice. The failure to object thus resulted in forfeiture.

## III. The trial court's instructions were proper

Among other instructions, the jury was instructed with CALCRIM Nos. 200 (instructing jurors to decide what happened "based only on the evidence that has been presented to you in this trial"); 220 (instructing jurors to "impartially compare and consider all the evidence that was received throughout the entire trial"); 222 (explaining that "evidence" included witness testimony, admitted exhibits, and stipulated facts, and instructing jurors to disregard anything they saw or heard when court was not in session); and 226 (instructing jurors, when deciding whether testimony was true and correct, to use their "common sense and experience").

Defendant does not assert that any of these instructions were incorrect, including the instruction that jurors decide what happened "based only on the evidence" presented at trial. Defendant contends, however, that the trial court erred by making a similar, individualized instruction when speaking directly with Juror No. 39. According to defendant, the court's instruction to Juror No. 39 that she disregard her prior experience with head injuries contravened legal principles laid out in *People v. Steele* (2002) 27 Cal.4th 1230 (*Steele*). Defendant points to the following language from *Steele*: "'[I]t is an impossible standard to require . . . [the jury] to be a laboratory, completely sterilized and freed from any external factors.' [Citations.] 'It is "virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote."'" [Citations.] A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow

11

those jurors to use their experience in evaluating and interpreting that evidence." (27 Cal.4th 1230, 1266.)

Defendant misapprehends the scope and nature of this quoted language, which is found in a discussion of alleged juror misconduct, not instructions given to a juror. In *Steele*, the defendant argued that certain jurors committed misconduct during deliberations by offering their own expertise regarding military service and medical issues, two subjects with relevance to the case. (*Steele*, *supra*, 27 Cal.4th 1230, 1265.) In finding that the trial court did not abuse its discretion in denying a new trial motion based on this asserted misconduct, our Supreme Court wrote: "A fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct." (*Id.* at p. 1266.) The court noted "it would be an impossibly high standard" to prevent the jurors from relying on or mentioning their background and personal experience. (*Id.* at p. 1267.)

*Steele* does not stand for the proposition that the trial court should encourage a juror's consideration of extrinsic evidence with little apparent relevance to the facts at issue. Juror No. 39 approached the court inquiring whether, in deliberating, she should consider her prior experiences with head injuries, stating that she "realize[d] it has nothing to do with this case." The trial court's response, that she should not consider the incidents and instead base her decision only on the evidence presented at trial, was consistent with California law.

"A jury's verdict in a criminal case must be based on the evidence presented at trial, not on extrinsic matters." (*People v. Leonard* (2007) 40 Cal.4th 1370, 1414 .) "An impartial juror is someone 'capable and willing to decide the case solely on the evidence' presented at trial." (*People v. Nesler* (1997) 16 Cal4th 561, 581.) As we have previously explained, while jurors will (in line with CALCRIM No. 226) use their "common sense and experience" in making decisions, "CALCRIM No. 226 does not tell jurors to consider evidence outside of the record, but merely tells them that the prism through

12

which witnesses' credibility should be evaluated is common sense and experience." (*People v. Campos* (2007) 156 Cal.App.4th 1228, 1240.)

Defendant provides no authority for the assertion that the trial court must affirmatively permit jurors to rely on specific life experiences when deliberating, particularly when these life experiences are not only irrelevant, but are also likely to create confusion. In arguing that Juror No. 39's prior experiences with head injuries were relevant, defendant avers that the issue before the jury was "the force necessary to cause brain injury." But this is a simplistic view of the evidence presented at trial, and an incorrect characterization of the prosecution's case.

The prosecution did not claim that a child could not suffer brain injury or death from a fall. Rather, the prosecution presented an extensive case concerning the unique injuries suffered by Isiah. These injuries included ruptured bridging veins, a subdural hematoma, hemorrhaging to Isiah's optic nerves, and extensive retinal hemorrhaging. This sort of complicated and abstruse evidence could only be presented by medical experts with experience in relevant medical fields.

Prosecution experts testified that Isiah's particular injuries were caused by abusive head trauma. Defendant's experts testified that they were more likely caused by a fall from the bed. Juror No. 39's experiences with head injuries had no bearing on the resolution of the cause of Isiah's unique injuries. The juror, who (again) herself recognized that the experiences had "nothing to do" with this case, did not claim that she or a relative suffered a subdural hematoma, retinal hemorrhaging, or another distinct injury at issue in the case. The trial court's instructions that Juror No. 39 set aside her prior experiences and decide the case only on the evidence presented at trial had no tendency to affect whether the juror believed the prosecution's experts or the defendant's.

Based on her statements to the trial court, Juror No. 39's prior experiences illustrated nothing more noteworthy than the fact that a person can be severely injured or die from a short fall. These prior incidents were clearly extrinsic to the matters at issue at trial and were irrelevant to the issue of how Isiah suffered his unique injuries. Furthermore, based on her statements to the trial court, it was initially unclear whether

13

Juror No. 39 was capable of deciding the case solely on the evidence. The trial court's instruction that she base her decision only on the evidence presented at trial, and disregard her personal experiences with head injuries, properly served to minimize the chance that the juror would base her decision on irrelevant, extrinsic evidence.[2]

Therefore, we find that the trial court's instructions to Juror No. 39 were proper, and defendant suffered no prejudice.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


                                        BOREN, P.J.

We concur:


ASHMANN-GERST, J.


CHAVEZ, J.

---

[2]     Because the trial court's instructions to Juror No. 39 were proper, defendant's argument that trial counsel provided ineffective assistance by failing to object to the instructions necessarily fails.